[Cite as *In re A.G.*, 2018-Ohio-2835.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.G.

C.A. No.     28861

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 15-09-610

DECISION AND JOURNAL ENTRY

Dated: July 18, 2018

HENSAL, Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that granted legal custody of the child A.G. to T.L. and D.L. ("Foster Father" and "Foster Mother"; collectively "Foster Parents"). This Court affirms.

I.

{¶2}    Mother is the biological mother of G.U. (d.o.b. 4/17/13) and A.G. (d.o.b. 8/26/15). Both children were medically fragile. While the case below was pending, G.U. succumbed to illness and passed away. Paternity of A.G. was never established.[1]

{¶3}    In early August 2015, Summit County Children Services Board ("CSB") received a report of medical neglect involving G.U. The young child had been repeatedly hospitalized to address a medical issue that Mother could have prevented with proper care. As CSB was

---

[1] Both a named alleged father and John Doe were served with notice of hearings by publication where required.

working with Mother on a voluntary basis, she gave birth to A.G. That child, too, had medical issues requiring her hospitalization. Based on, among other things, Mother's demonstrated inability to provide proper care for the children, CSB filed a complaint in September 2015, alleging that G.U. was neglected and dependent, and that A.G. was dependent. The agency was granted an emergency order of temporary custody the same day and placed both children together in a foster home certified for placement of medically fragile children.

{¶4} At the adjudicatory hearing, CSB withdrew its allegation of neglect, and Mother stipulated to a finding that both children were dependent. Evidence of dependency as to all fathers was presented. At the subsequent dispositional hearing, the juvenile court placed the children in the temporary custody of CSB and adopted the agency's proposed case plan as the order of the court. CSB used reasonable efforts to facilitate Mother's reunification with the children. Nevertheless, Mother struggled and indicated to both CSB and the guardian ad litem that she wished to relinquish her parental rights if the foster parents would agree to adopt both children. After investigating and disqualifying all relatives identified by Mother for placement of the children, CSB filed a motion for permanent custody in August 2016.

{¶5} The juvenile court scheduled and continued the permanent custody hearing multiple times. In the interim, CSB amended the case plan and filed an amended motion for permanent custody, based in part on the intervening death of G.U. Despite its motion for permanent custody, the agency consistently maintained reunification with parent, custodian, or guardian as the case plan goal for each subsequent amendment. CSB filed a third motion for permanent custody at the end of March 2017, in which it alleged for the first time that a relative had come forward expressing an interest in obtaining custody of A.G., that the relative had been approved by the agency's kinship department, but that that agency could not approve the

relative's child care plan. In addition, the motion alleged that the relative's home composition was changing, so a new home assessment would be necessary. Accordingly, CSB maintained its request for permanent custody based on allegations that A.G. had been in its temporary custody for twelve or more months of a consecutive twenty-two-month period, that the child was abandoned, that the child could not or should not be returned to parents; and that an award of permanent custody was in the child's best interest.[2]

{¶6} Mother filed a motion for legal custody to her half-sister ("Aunt"). The guardian ad litem filed a motion for permanent custody, alleging that the child was abandoned, had been in the temporary custody of CSB for at least twelve months, and could not or should not be placed with her parents; and that an award of permanent custody was in the child's best interest. Immediately prior to the hearing, the guardian ad litem orally amended the motion to include an alternative disposition of legal custody to Foster Parents. CSB withdrew its motion for permanent custody and filed a motion for legal custody to Aunt. Foster Parents moved to intervene and also filed their own motion for legal custody of A.G. The juvenile court denied Foster Parents' motion to intervene as parties, but considered a motion for legal custody to Foster Parents pursuant to R.C. 2151.353(A)(3).

{¶7} At the final dispositional hearing, the juvenile court granted a separation of witnesses and did not allow Foster Parents to observe the hearing. In addition, while the court allowed Foster Parents to prosecute their motion for legal custody, it did not allow them to cross-

---

[2] CSB's second motion for permanent custody (its "amended motion") was reasonably necessary to remove G.U., who had passed away. It is unclear why the agency filed a third motion for permanent custody, given the pending amended motion. In its third motion for permanent custody, CSB for the first time alleged that A.G. had been in the agency's temporary custody for at least twelve months. As CSB ultimately withdrew its request for permanent custody, this Court declines to address the propriety of the filing of its third motion. *But see In re J.B.*, 9th Dist. Summit Nos. 28752 and 28753, 2018-Ohio-244.

examine any witnesses they themselves did not plan to call in support of their motion. On the record, Aunt, Foster Mother, and Foster Father each authenticated their respective statements of understanding for legal custody pursuant to R.C. 2151.353(A)(3).

{¶8} The juvenile court issued its judgment, granting legal custody of A.G. to Foster Parents and denying the remaining three motions. The court further ordered that Aunt was allowed to have at least one weekly overnight visitation with the child. Mother filed a timely appeal in which she raises six assignments of error. This Court consolidates some assignments of error to facilitate review.

II.

ASSIGNMENT OF ERROR I

THE DECISION PLACING THE CHILD IN THE LEGAL CUSTODY OF
FOSTER PARENTS DOES NOT SPECIFY THE RELIEF AFFORDED TO ALL
PARTIES AS IT DOES NOT SPECIFY MOTHER'S RIGHT TO
REASONABLE VISITATION[.]

{¶9} Mother argues that the juvenile court's judgment is not a final, appealable order, as it does not order visitation for Mother. This Court disagrees.

{¶10} As juvenile court proceedings constitute special statutory proceedings, and an award of legal custody affects a parent's substantial rights, "an order granting legal custody is a final order from which an appeal may be taken[,]" regardless of whether or not the juvenile court has issued a visitation order. *In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 7-8. In this case, the juvenile court awarded legal custody to a third party. That judgment, therefore, was a final, appealable order despite the lack of an order therein awarding specific visitation to Mother.

{¶11} To the extent that Mother argues that the juvenile court erred by failing to award her any visitation with the child, the argument is not well taken. As an initial matter, Mother did

not request visitation in her motion for legal custody to Aunt and made no argument regarding what would constitute reasonable visitation. Moreover, the evidence adduced at the hearing clearly demonstrated that Mother had had no contact with A.G. during the eight months prior to the hearing. Before that, Mother rarely visited with the child. The caseworker testified that Mother had moved out of state and had another child. Those circumstances gave rise to intervention by another child welfare agency. Accordingly, Mother failed to present any evidence on which the juvenile court could reasonably order visitation between Mother and A.G. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE JUVENILE COURT'S GRANT OF LEGAL CUSTODY TO FOSTER PARENTS AS OPPOSED TO MATERNAL AUNT WAS NOT THE LEAST RESTRICTIVE PLACEMENT AND VIOLATED MOTHER'S DUE PROCESS RIGHTS[.]

{¶12} Mother argues that the juvenile court erred by granting legal custody to Foster Parents, because legal custody to Aunt would have constituted the least restrictive placement. Mother's argument is not well taken.

{¶13} Mother relies on O.A.C. 5101:2-42-05 in arguing that the juvenile court was precluded from awarding legal custody to Foster Parents when a suitable relative was available to accept legal custody. O.A.C. 5101:2-42-05(E) addresses the agency's selection of a placement setting for a child in its temporary custody. The placement must be both in the child's best interest and the least restrictive setting. *Id.* Subsection (F) classifies the home of a suitable relative as less restrictive than a foster home. O.A.C. 5101:2-42-05(F)(1) and (3). These administrative code provisions by their plain language, however, do not form the basis for the juvenile court's determination regarding final dispositional motions. Accordingly, Mother's argument is misplaced.

{¶14} In considering the guardian's motion for permanent custody, the juvenile court was required to determine whether one of the first-prong grounds for permanent custody existed, and if so, whether an award of permanent custody was in the child's best interest. R.C. 2151.414(B)(1)/(2). Having concluded that permanent custody was not in A.G.'s best interest, the juvenile court was then required to consider the competing motions for legal custody. In this regard, the juvenile court was required to consider solely the best interest of the child. *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, ¶ 24 ("The critical inquiry before awarding legal custody is to consider the current parenting abilities of each potential custodian and to determine whether it is in the best interest of the child to be placed in the legal custody of any of them."). In considering the best interest of A.G., the juvenile court applied the appropriate test before awarding legal custody to Foster Parents. It was not error that the juvenile court did not consider the least restrictive placement setting for the child.

{¶15} To the extent that Mother argues that the juvenile court erred by failing to modify the child's placement from the foster home to Aunt's home pending final disposition, this argument also fails. A substitute care setting is warranted only if it meets certain criteria and is in the best interest of the child. O.A.C. 5101:2-42-05(E); *see also In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, ¶ 24. The juvenile court's determination regarding substitute placement will be upheld absent an abuse of discretion. *In re A.J.* at ¶ 27. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). Given both A.G.'s stable acclimation into the foster home and the fact that the child had never met Aunt during the first 18 months of the

case, the juvenile court was not unreasonable in declining to disrupt the child four months later from the only home she had ever known shortly before the final dispositional hearing. Mother's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE JUVENILE COURT COMMITTED PLAIN ERROR TO APPELLANT-MOTHER'S PREJUDICE WHEN IT ALLOWED THE FOSTER PARENTS TO FULLY PARTICIPATE IN ALL PORTIONS OF THE TRIAL THEREBY IMPEDING ON MOTHER'S DUE PROCESS RIGHTS[.]

{¶16} Mother argues that the juvenile court committed plain error by not dismissing Foster Parents' motion for legal custody and by instead allowing them to prosecute their motion, because they were not parties to the case. This Court disagrees.

{¶17} Mother cites *In re J.B.*, 8th Dist. Cuyahoga No. 103521, 2016-Ohio-5513, for the proposition that "[a] nonparty motion is not a proper vehicle for seeking custody in a pending case because only parties may file motions." ¶ 43, citing Juv.R. 2(Y), and *In re A.S.*, 8th Dist. Cuyahoga No. 102697, 2015-Ohio-4386, ¶ 12. This Court need not reach this specific issue, because a motion for legal custody to Foster Parents was otherwise pending before the juvenile court pursuant to valid statutory authority.

{¶18} Revised Code Section 2151.353(A)(3) allows the juvenile court to

[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child *or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings*.

(Emphasis added.) By definition, the guardian ad litem is a party to the proceedings. Juv.R. 2(Y).

{¶19} The guardian ad litem filed a dispositional motion. While requesting permanent custody, the guardian strongly advocated that the child remain with Foster Parents in her best

interests. Moreover, prior to the presentation of evidence and the dispositional hearing, the guardian ad litem orally amended the motion for permanent custody to include an alternative disposition of legal custody to Foster Parents. The guardian ad litem called a witness and also presented her own report to the court. Accordingly, a party to the proceedings prosecuted the motion for legal custody to Foster Parents, while Foster Parents themselves did not call any witnesses or present any independent evidence. Because the guardian ad litem, as a party to the proceedings, maintained a motion for legal custody to Foster Parents for the juvenile court's consideration, the court committed no error, plain or otherwise, by failing to dismiss nonparty Foster Parents' motion. Mother's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE JUVENILE COURT COMMITTED PLAIN ERROR WHEN IT PERMITTED A NONPARTY WITNESS TO REMAIN IN THE COURT DURING ALL PHASES O[F] TRIAL PRIOR TO THEIR TESTIMONY.

{¶20} Mother argues that the juvenile court committed plain error by allowing nonparty Foster Parents to remain in the courtroom prior to the presentation of their testimony. In addition, Mother argues that it was plain error to allow nonparty Foster Parents to cross-examine witnesses. This Court disagrees.

{¶21} As a preliminary matter at the commencement of the dispositional hearing, Mother's attorney moved for a separation of witnesses, because she believed that Foster Parents would be testifying. The juvenile court responded, "Okay. And they would need to leave the courtroom then because they are not parties." The attorney for the guardian ad litem asserted that he would only be presenting the testimony of Foster Mother. The juvenile court cautioned that "if you plan on putting the foster father on the stand at some point, he would need to leave as well." Neither foster parent remained in the courtroom during the proceedings prior to their

testimony near the end of the hearing. In fact, Foster Father did not even return to the courtroom during Foster Mother's testimony. Mother's argument that Foster Parents were present during all phases of the hearing prior to their testimony is not supported by the record. No error, therefore, occurred. Mother's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR V

THE JUVENILE COURT[']S AWARD OF LEGAL CUSTODY TO FOSTER PARENTS WAS NOT IN THE BEST INTEREST OF THE MINOR CHILD[.]

ASSIGNMENT OF ERROR VI

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR BY PLACING THE CHILD IN THE LEGAL CUSTODY OF FOSTER PARENTS EVEN IF THE ERRORS ABOVE TAKEN INDIVIDUALLY ARE HARMLESS, TAKEN TOGETHER CUMULATIVELY SHOW THAT THE ORDER IS AGAINST THE MANIFEST WEIGHT OF PROPER EVIDENCE[.]

{¶22} Mother argues that the juvenile court's award of legal custody to Foster Parents was against the manifest weight of the evidence. This Court disagrees.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶23} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations

omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶24} After a child has been adjudicated neglected, dependent, or abused, the juvenile court considers solely the best interest of the child in its determination of whether to place the child in the legal custody of a parent or a third party. *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. We reiterate that "[t]he critical inquiry before awarding legal custody is to consider the current parenting abilities of each potential custodian and to determine whether it is in the best interest of the child to be placed in the legal custody of any of them." *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, at ¶ 24, citing *In re K.C.*, 9th Dist. Summit Nos. 26992 and 26993, 2014-Ohio-372, ¶ 20.

{¶25} The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist.

Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶26} Since birth, A.G. has been a medically fragile child. Respiratory issues due to underdeveloped lungs resulted in three surgeries, and the ongoing use of inhalers and occasional breathing treatments. Although the child's airways have improved, she remains susceptible to illness and allergens. In addition, A.G. suffers from gastroesophageal reflux disease ("GERD"), which mandates the use of a thickener before the child ingests liquids of any kind, lest she aspirate the liquid into her lungs. The effects of such aspiration are grave, as it could lead to pneumonia and the child's death. Accordingly, any caregiver for the child must be aware of the danger and trained either to use a thickener or avoid the food. Even seemingly innocuous foods like popsicles and fruit cups present a danger to the child. There was no testimony that A.G. will outgrow her GERD.

{¶27} When she was two weeks old, A.G. was released from the hospital and placed with Foster Parents into the only home the two-year old has ever known. A.G. did not meet Aunt until the child was 18 months old. Short visits began the following month. Aunt then had weekly eight-hour visits with A.G. for three months, before overnight visits began. Although the child has had one to two weekly overnight visits with Aunt during the four months before the hearing, those lengthier visits have been somewhat taxing on the child. The child has never lived with Mother, and Mother had in fact not visited with A.G. at all during the eight months before

the hearing. At the time of the hearing, Mother had relocated out of state and had another baby who became involved in the child welfare system.

{¶28} A.G. is closely bonded with Foster Parents and their children. She is particularly close with a teenage girl in the home. The child is very comfortable with the many members of Foster Parents' extended family and sees them on a regular basis. A.G. has also begun to develop a bond with Aunt, and the child is comfortable around Aunt's father, who is not her biological relative.

{¶29} There are no concerns about Foster Parents' ability to meet the child's basic and special (medical) needs. Foster Father works fulltime, while Foster Mother home schools all the children. Their housing situation is stable. Foster Mother attends all of A.G.'s medical appointments and monitors the child's care. Foster Parents provide transportation to facilitate visitation with Aunt. Although they hope to adopt the child, Foster Parents have asserted that they will ensure that A.G. maintains a relationship with Aunt and Aunt's father.

{¶30} The CSB caseworker had no concerns regarding Aunt's ability to meet the basic and medical needs of the child. Aunt was living in a two-bedroom subsidized apartment, and had the option to receive a three-bedroom apartment if she obtained legal custody of the child. Prior to obtaining her apartment, Aunt had been living with a sister, having earlier been evicted. Aunt's young teenage son stays with her on weekends and in the summer. The caseworker found him to be very polite. The guardian ad litem reported that Aunt's son did not voice opposition to having A.G. in his mother's household, but he was noncommittal regarding the situation.

{¶31} Although Aunt does not have a driver's license or vehicle, she has nearby family support. She testified that her father, brother, sister, and a friend who all live nearby have all

agreed to provide transportation, especially in the event that A.G. experiences a medical emergency and requires immediate medical care. While Aunt testified that she would move to Akron to be closer to the child's physicians if necessary, she did not explain what impact such a move might have on the availability of her relatives and friends to provide timely support should A.G. require medical care.

{¶32} The child is too young to express her wishes regarding custody. The guardian ad litem, however, opined that the child's best interest would be served by allowing her to remain with Foster Parents in the only home environment the child has ever known and where her needs were being met fully. Accordingly, the guardian supported an award of permanent custody so that Foster Parents could adopt A.G. In the alternative, the guardian supported an award of legal custody to Foster Parents. The guardian ad litem recognized that Aunt loves A.G. and should be allowed to maintain contact with the child. She was concerned, however, that the child would have to attend daycare if she was placed in Aunt's legal custody. The guardian reported:

> Concerns regarding daycare include the possibility of not identifying subtle health changes early enough to avoid conditions such as pneumonia. Also, with [the child's] inability to safely ingest liquids, it may be difficult to prevent [the child] from taking another child's drink.

{¶33} In addition, the guardian ad litem raised concerns regarding Aunt's criminal history and history with CSB. Aunt had earlier convictions for felony stolen check and misdemeanor disorderly conduct offenses. More troubling, however, was a 2014 intimidation conviction arising out of threats made by Aunt to another woman on behalf of Aunt's paramour to dissuade the woman from testifying against the paramour in a criminal trial. Aunt's involvement with CSB arose out of her son's witnessing domestic violence against Aunt by her paramour, as well as an incident of corporal punishment by Aunt which left a mark on her son's body. Although Aunt testified that she will not have contact with her prior paramour after he is

released from prison, she admitted that she recently spoke with him at the request of his mother, a woman with whom Aunt maintains a relationship.

{¶34} Both Foster Parents and Aunt recognize the importance of allowing A.G. to maintain a relationship with her biological relatives. Aunt agreed to facilitate a relationship between the child and Mother, but only if Mother demonstrated stability and consistency. Aunt also agreed to allow A.G. to maintain a relationship with the foster family, but not until the child settled into a routine in Aunt's home. Foster Mother testified that, even if she and Foster Father adopted the child, they would continue to ensure that A.G. had ongoing regular contact with Aunt, as well as Mother should she be granted visitation with the child.

{¶35} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in awarding legal custody of A.G. to Foster Parents. The evidence established that the child was well integrated into a family environment with the only caregivers she had ever known. The child suffers from some significant medical issues, and proper monitoring and timely medical care are crucial to averting potentially life threatening emergencies. Foster Parents have consistently met her medical and basic needs in a stable, nurturing environment. While Aunt demonstrated a commitment to ensuring the health of the child, Aunt had only been to two of the child's medical appointments. Moreover, if placed in Aunt's custody, A.G. would have to attend daycare where the lack of intensive supervision could put her health at risk.

{¶36} Foster Parents have consistently facilitated visitations between the child and Aunt, and they have asserted that they would continue to do so. On the other hand, although Aunt recognized the importance of the bond between A.G. and Foster Parents, Aunt did not intend to allow the child to visit with Foster Parents until she believed the child had adjusted to living with

her. The guardian ad litem, who had frequent contact with the caseworker, Foster Parents, Aunt, and the child, opined that it was in the best interest of A.G. that she remain in the safe and stable environment provided by Foster Parents. Under the circumstances, notwithstanding Aunt's love and desire to care for A.G., the juvenile court's finding that an award of legal custody to Foster Parents was in the best interest of the child was not against the manifest weight of the evidence. Mother's fifth and sixth assignments of error are overruled.

III.

{¶37} Mother's six assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CALLAHAN, J.
CONCURS.

CARR, P. J.
CONCURS IN JUDGMENT ONLY.


APPEARANCES:

AVIVA WILCHER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE CORGAN, Assistant Prosecuting Attorney, for Appellee.

CORINNE HOOVER SIX and RACHEL L. SMICK, Attorneys at Law, for Appellees.

JOSEPH M. KERNAN, Guardian ad Litem.